UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE,<br><br>     Plaintiff,<br><br>        v.<br><br>SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts,<br><br>     Defendant. | Case No. 1:21-cv-00305-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Sara Omundson's Motion to Dismiss (Dkt. 7) and Plaintiff Courthouse News Service's ("CNS") Motion for Preliminary Injunction (Dkt. 14).

The Court held oral argument on February 18, 2022, and took the matters under advisement. Upon review, and for the reasons outlined below, the Court DENIES Omundson's Motion to Dismiss and DENIES CNS's Motion for Preliminary Injunction.

## II. OVERVIEW

The First Amendment covers some of the most recognized rights under the United States Constitution. At issue in this case is whether the First Amendment confers a right to access documents filed in court, and, if so, at what point in time does that right attach.

Assuming such a right exists, the Court must also consider whether any procedures utilized for processing court documents are justified in scope and timing.

Plaintiff, CNS, brings the present suit in an effort to remedy what it sees as a violation of its right to speedily access materials filed in Idaho state court. It argues that the electronic case filing system used in Idaho delays its access to noteworthy materials and that these delays are unreasonable, unnecessary, and, ultimately, unconstitutional. CNS asks the Court to preliminarily enjoin the current scheme in Idaho until these matters can be resolved. Notably, CNS has brought, or is currently bringing, similar suits in numerous states throughout the country. Some have been resolved in CNS's favor, others have not. Some are still on appeal.

Defendant Sara Omundson has asked that the Court dismiss CNS's lawsuit in its entirety claiming that the redress CNS seeks is foreclosed by prior caselaw and under the legal doctrine of abstention.

### III. BACKGROUND[1]

CNS is a nationwide news service founded more than thirty years ago upon the belief that a great deal of news about civil litigation goes unreported or underreported by traditional news media outlets. It offers a variety of publications to thousands of subscribers nationwide. Sara Omundson is the Administrative Director of Idaho Courts and, in her official capacity, is responsible for the administration of the statewide e-filing and public

---

[1] The following facts are taking from CNS's complaint and presumed true for purposes of the instant motion. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

access systems used by state courthouses in Idaho.

The crux of this lawsuit centers on the timeliness of media access to new civil complaints filed in Idaho state court.

Historically, reporters in Idaho—such as Boise-based reporter Cathy Valenti, who writes for CNS—would travel to various courthouses near the end of the day and review any new complaints filed that day. For example, in Ada County, new complaints were typically placed in a press-review box, or cart, that enabled the press to review and report the contents of newly filed civil complaints. The complaints may, or may not, have been "processed," "screened," or "administratively reviewed" prior to being placed in the press-review box.

The advent of technology made case filing even easier. With the development of electronic filing systems, individuals can automatically upload documents to the Court system, thus eliminating the need for "runners" to hand-deliver materials. In addition, much of the physical work done at a courthouse intake counter was eliminated. At the same time, however, clerical staff still needed to (at some point) review the submissions to ensure compliance with all appropriate rules and procedures.

In 2015, Idaho courts began migrating to an e-filing system through their adoption of Tyler Technologies' Odyssey software suite, branded for Idaho Courts as "iCourt." Implementation wrapped up in 2018. Odyssey allows parties to submit electronic documents to Idaho's courts from anywhere in the world and at any time—the proverbial "24/7/365."

Tyler provides courts using the Odyssey program with several options for making

MEMORANDUM DECISION AND ORDER - 3

new e-filings available to the press and public. The *default* configuration withholds newly filed civil complaints until after a clerk manually processes and "accepts" them. Idaho employs this default method.[2] CNS argues that waiting for this "acceptance" or "processing" procedure results in delays that (1) did not previously occur with paper filings and (2) are not acceptable under the First Amendment.

CNS brought suit asking the Court to find certain policies and procedures of the Idaho state courts unconstitutional under the First and Fourteenth Amendments. CNS also asks the Court to issue a preliminary and permanent injunction against Omundson (and her agents, successors, etc.) curtailing the current procedure which "den[ies] access to complaints until after administrative processing." Dkt. 1, at 15.

Shortly after CNS filed its Complaint, Omundson filed a Motion to Dismiss (Dkt. 7) arguing that CNS had not stated a claim upon relief could be granted and, alternatively, that the Court should decline to exercise jurisdiction over this case based upon principles of abstention. CNS opposes the Motion. Dkt. 11.

For its part, CNS doubled down on its prayer for injunctive relief and filed a formal Motion for Preliminary Injunction. Dkt. 14. Omundson opposes that motion. Dkt. 20.

The Court set both matters for hearing. Dkt. 22.

Following the close of briefing on the two pending motions, but before the hearing, Omundson filed a Notice of Supplemental Authority. Dkt. 28. As the Court alluded to above, this is not the sole case related to these issues CNS has filed. In fact, there appear

---

[2] As will be explained below, an alternate method involves newly filed complaints being placed in a "press review queue," which allows the press to view the documents *prior* to administrative or clerical review.

to be roughly a dozen such cases in varying stages throughout the country. One such case, out of the District of Maine, was recently dismissed. CNS has appealed that dismissal to the First Circuit Court of Appeals. The Conference of Chief Justices—an organization comprised of state judicial officers—has apparently filed an amicus brief before the First Circuit for consideration in that case. It is that brief Omundson wishes to present to the Court via supplement. CNS contends the Court should not give the amicus brief any weight as it involves an issue that was not before the Maine District Court (abstention) and because the position the Conference of Chief Justices takes is in stark contrast to Ninth Circuit precedent. Dkt. 30. The Court notes this submission but finds it of marginal relevance to the issues before it today.

Omundson also filed a sur-reply addressing various calculations CNS used in support of its argument that there are delays in Idaho state court. Dkt. 29. CNS does not object to Omundson's sur-reply, but contends the information does not change any of the arguments presented in briefing. Dkt. 31. CNS's acquiesces aside, the Court would have preferred this submission had been filed as a motion. Omundson recognizes the standard procedure of seeking leave to file a sur-reply (Dkt. 29, at 1) but chose not to actually utilize the process. As the Court has explained before, "*[a]bsent permission by the Court*, neither the District of Idaho's local rules, nor the Federal Rules of Civil Procedure, permit sur-replies." *Stanger v. Way*, 2021 WL 4303605, at *4 (D. Idaho Sept. 21, 2021) (emphasis added). Nevertheless, because the information contained in the sur-reply is unopposed (and appears relevant), the Court will accept, and consider, the submission.

The week of the hearing, CNS filed a Notice of Supplemental Authority bringing to

the Court's attention a recent decision by a magistrate judge of the District of Oregon in a case substantially similar to this one.[3] Dkt. 32. The Court notes this submission. The Oregon District Judge adopted the Magistrate Judge's decision over an objection by the Defendant, and many of the underlying issues are the same as presented here.[4] Thus the Court finds the analysis therein helpful.

Finally, after the hearing, both parties filed supplements answering questions posed by the Court during oral argument. Dkts. 33, 35. The Court appreciates the parties' diligence in responding to its inquires.

## IV. DISCUSSION

### A. Motion to Dismiss

In her Motion to Dismiss, Omundson argues CNS has failed to state a claim upon which relief can be granted because no one has a First Amendment right to immediate and instantaneous access to court filings in light of existing Ninth Circuit law. Alternatively, Omundson asks the Court to decline to exercise jurisdiction under principles of abstention, equity, comity, and federalism because of the nature of the requested relief: changes to Idaho state court proceedings.

#### 1. Rule 12(b)(6) Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." "A Rule 12(b)(6)

---

[3] *Courthouse News Serv. v. Cozine*, 2022 WL 593603 (D. Or. Feb. 14, 2022).

[4] Courthouse News Serv v. Cozine, 2022 WL 1000775 (D. Or. Apr. 4, 2022). The District Judge's decision was issued after oral argument in the present case, but before this decision was rendered.

dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (cleaned up). Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1121.

A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. The complaint must also contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570. In considering a Rule 12(b)(6) motion, the Court must view the complaint in the light most favorable to the claimant and "accept[ ] all well-pleaded factual allegations as true, as well as any reasonable inference drawn from them." *Johnson*, 534 F.3d at 1122.

   *2.   Claim for Relief Analysis*

As a threshold matter, the Court must review an important line of cases out of California and the Ninth Circuit as they frame the issues today and are binding on the Court. Notably, the parties agree that these cases provide the applicable standard for evaluating whether Omundson and Idaho courts are violating CNS's access to newly filed complaints. That said, the parties strongly disagree about certain nuances in the cases and whether they apply to the situation at bar.

The Ninth Circuit's decision in *Courthouse News Service v. Planet* ("*Planet III*")

provides the applicable standard for evaluating whether a court's administrative procedures violate the media's "right of timely access to newly filed nonconfidential complaints." 947 F.3d 581, 585 (9th Cir. 2020). *Planet III* established a two-pronged test for this analysis. Under the first prong, a reviewing court must determine whether "the qualified First Amendment right of access" exists as to the judicial record in question. *Id*. In making this determination, the court considers various factors outlined by the United States Supreme Court, including, "(1) whether that proceeding or record 'ha[s] historically been open to the press and general public' and (2) 'whether public access plays a significant positive role in the functioning of the particular [governmental] process in question.'" *Id.* at 590 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986) ("*Press Enterprise II*"). If both factors are evident, a qualified First Amendment right of access attaches to the implicated judicial records. Under the second prong, the reviewing court then considers whether a restriction on that right "is essential to preserve higher values and is narrowly tailored to serve those interests." *Id.* at 595 (quoting *Press-Enterprise II*, 478 U.S. at 13–14).

A look back at the *Planet* trilogy of cases helps to contextualize the Ninth Circuit's ruling in *Planet III.*

The *Planet* cases involved legal challenges brought by the same plaintiff as in this case, CNS, against two case filing procedures adopted by the Ventura County Superior Court in California ("Ventura Court"). In the first procedure, the Ventura Court offered a physical bin where members of the media could access new filings *after* they had been processed. *Id.* at 586. The Ventura Court's "processing" procedure required court staff to

MEMORANDUM DECISION AND ORDER - 8

perform the following seven-steps:

> First, a [court assistant] reviews the documents to determine that the complaint is being filed in the correct court and the documents necessary to initiate the case are presented with the correct filing fee or fee waiver. Second, the [court assistant] enters all the required case information to "create" a new case in [the court's case management system]. Third, all accompanying instruments, for example checks, are entered and the receipt is generated. Fourth, any summons required are issued. Fifth, the documents are stamped as "Filed." Sixth, the labels generated from [the Court's case management system] are placed on the physical case file, along with the filing date, courtroom assignment, and case destruction stamp. Finally, the documents are placed in a physical case file.

*Courthouse News Serv. v. Planet*, 2016 WL 4157210, at *4 n.6 (C.D. Cal. May 26, 2016).

Some complaints were also subjected to a quality check process that took "one to several days to complete." *Id.* at *4. Further, complaints requiring "immediate judicial review" were immediately sent to judges, with copies of only the first pages of the complaint placed in the physical bin. *Planet III,* 947 F.3d at 586–87. The overall policy created "significant delays between the filing of a complaint and its availability" to the press. *Id.* at 587.

After the plaintiff filed suit over the seven-step policy outlined above, the Ventura Court instituted a new "scanning policy." *Id.* This procedure required court clerks to "scan all new civil complaints before reviewing or processing them." *Id.* The scanned complaints were accessible via computer terminals located in the Ventura Court's clerk's office, and reporters could view the documents during a seven-hour window on the days the court was open. *Id.* Scans of cases filed after the conclusion of each seven-hour window were made available on the terminals the next day. *Id.*

In the original *Planet* lawsuit, the district court dismissed the case under the

*Pullman*[5] and *O'Shea*[6] abstention doctrines. *Courthouse News Serv. v. Planet*, 2011 WL 11715054 (C.D. Cal. Nov. 30, 2011) (*Planet I*). On appeal in *Planet I*, the Ninth Circuit reversed the decision to abstain and remanded the case to the district court for further proceedings. 750 F.3d 776 (9th Cir. 2014). Upon remand, the district court "erroneously interpret[ed]" the Ninth Circuit's mandate and "ruled on a different issue entirely." *Courthouse News Serv. v. Planet,* 2014 WL 12740134 (C.D. Cal. Aug. 28, 2014) (*Planet II*). This led the Ninth Circuit to again reverse in *Planet II* and reassign the case to a different judge. 614 F. App'x 912 (9th Cir. 2015). The new judge ultimately issued a declaratory judgment and permanent injunction in plaintiff's favor, and cross-appeals at the Ninth Circuit followed, resulting in the decision now known as *Planet III*. *Courthouse News Serv. v. Planet*, 2016 WL 4157354 (C.D. Cal. June 14, 2016).

Having already rejected any arguments relative to abstention, the Ninth Circuit, at long last, addressed the constitutionality of the Ventura Court's policies in *Planet III.* As to the first question—whether the qualified right of access applies to newly filed civil complaints—the Ninth Circuit concluded that "the First Amendment right of access to information reaches civil judicial proceedings and records," and the parties agreed the Ventura Court had a "long-standing policy of providing timely access to court records" and that "experience and logic support a public right of access to newly filed civil complaints." *Planet III*, 947 F.3d at 590–91. In short, the parties in *Planet III* had not been at odds on

---

[5] *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941).

[6] *O'Shea v. Littleton*, 414 U.S. 488 (1974).

this point.

The parties were, however, at odds as to *when* this qualified First Amendment right attached to newly filed civil complaints. Ventura Court argued the right attached "only at the moment [the pleading becomes] the subject of some type of judicial action." *Id.* at 591. The Ninth Circuit rejected this argument, finding that "[ab]sent a showing that there is a substantial interest in retaining the private nature of a judicial record, once documents have been filed in judicial proceedings, a presumption arises that the public has the right to know the information they contain." *Id.* at 592 (citing *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)). Instead, the Ninth Circuit concluded that the media's qualified First Amendment right attached to newly filed civil complaints as soon as they are "filed in judicial proceedings." *Id.* As the Court will explain in detail below, *when* a document is considered "filed" is hotly contested in the present case.

After finding that a First Amendment right of access attached to newly filed complaints, the *Planet III* court reviewed the Ventura Court's two different filing processes. The Circuit ultimately concluded that only the seven-step process unconstitutionally infringed upon the media's right of access. The second process—the "scanning" procedure—survived scrutiny and was deemed constitutional. *Id.* at 595–600. As part of its decision, the Ninth Circuit articulated the tension between a court's need to administratively process complaints, and the media's right to deliver news to the general public:

> Though we conclude, as did the district court, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court, we do not view that conclusion as demanding immediate, pre-

> processing access to newly filed complaints. At the same time, however, we recognize, like the district court, that a necessary corollary of the right to access is a right to timely access. CNS's reporting on complaints must be timely to be newsworthy and to allow for ample and meaningful public discussion regarding the functioning of our nation's court systems.

*Id.* at 594. This language is also at the heart of one of the disputes—if not the main dispute—in this case.

Like the parties in *Planet III*, the parties in this case do not dispute the materials in question have historically been available to the public in Idaho and both agree that public access to these types of documents is important. Also like the parties in *Planet III*, however, the parties here dispute when this right attaches and whether any delays in "processing" are acceptable.

Omundson begins her Motion to Dismiss by citing the above-quoted language from *Planet III* that the Circuit did not view its conclusion as "demanding immediate, pre-processing access to newly filed complaints." *Id*. at 594. Omundson then quotes a line from *Planet III*'s introduction—that the press's qualified right to timely access "does not entitle [them] to *immediate* access . . ." *id.* at 585 (emphasis added)—and concludes that CNS's request in this case for immediate access to materials is already barred by binding Ninth Circuit caselaw.

CNS begins by correcting Omundson and explaining that it did not bring this suit claiming to have a "right to immediate access," but that it brought suit because her procedures result in delays and she cannot justify those delays under the second prong of the *Press-Enterprise II* test. CNS then emphasizes that nothing in *Planet III* forecloses this lawsuit. Each state has different procedures, and those procedures must be evaluated under

the appropriate test to determine if they withstand scrutiny.

First, the Court agrees (with both parties) that *Planet III* does not mandate CNS get "immediate" access to court filings. The Court also agrees that CNS is not actually asking for immediate access; it is asking for un-delayed access. Thus, the relevant question is whether any delay is occurring in Idaho and, if so, whether that delay is justifiable. Despite fairly substantial briefing from the parties on this issue, the Court finds it cannot answer that particular question at this time.

While the Court finds that *Planet III does not* preclude this lawsuit as Plaintiff suggests—and, as will be discussed below, finds that abstention does not apply either—the Court is unwilling to move to the second step of the *Press-Enterprise II* analysis on the current record. The Court has excellent briefs before it and numerous declarations in support of both sides. That said, the Court is persuaded by Omundson's commentary during oral argument regarding when, if ever, other courts have addressed the critical second prong of the test. This question—whether any restriction on CNS's right "is essential to preserve higher values and is narrowly tailored to serve those interests," *Planet III*, 947 F.3d at 595 (cleaned up)—is very fact driven. Such would not typically be appropriate at the motion to dismiss stage.

Other Courts have reached this determination to be sure, but some Courts did so at a procedurally different posture than what is before the Court now.[7] Others have been in a

---

[7] In the District of Oregon for example, even though the case was relatively young—much like the situation here—Defendants moved for summary judgment as opposed to moving to dismiss. This provided the Court a broader record and allowed it the opportunity to review whether there were factual disputes at issue. *See Cozine*, 2022 WL 593603, at *2.

similar procedural posture but had different briefing[8] or different proceedings.[9] There are, no doubt, varying reasons for why each court chose to analyze the issues before it in the manner it did, but the Court here is unprepared to take a step in either direction at this stage on the limited record before it. *Could* the Court make a ruling now? Maybe. But it would rather adjudicate the pending motions first and then allow more tailored briefing on the merits of the second question under *Press-Enterprise II*.

The Court is not implying other courts took a less-than desired approach. For her part, Omundson expressed surprise at other courts' approaches and even went so far as to claim many "have not followed that second scale." Dkt. 36, at 54. In reviewing decisions from other courts, it appears most did, in fact, reach the relevant second question. The manner in which they did so, however, is what appears to startle Omundson and is, frankly, why the Court will not take that step today. And to be fair, while some courts made their determination during summary judgment proceedings, others did so at the preliminary injunction stage. Those that ruled against CNS have been appealed. And those that ruled in favor of CNS then required the state court to take action—which they did. Thus, it is not clear how, if at all, those cases proceeded following the preliminary injunction phase. Regardless, the Court finds it odd to make a preliminary ruling that would require action,

---

[8] In the District of Maine, while similarly at the Motion to Dismiss / Motion for Preliminary Injunction stage, the court there was presented with arguments that allowed it to proceed beyond the pleadings and reach a conclusion as to the constitutionality of the restrictions. *Courthouse News Serv. v. Glessner*, 549 F. Supp. 169, 193(D. Me.  2021).

[9] In *Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *1 (D. Vt. Nov. 19, 2021), the Court—with the parties' permission—consolidated the hearing on the preliminary injunction with a trial on the merits. Again, this allowed that court to go further than this Court can go today.

when the unanswered merits-based question could render that action unnecessary.

The Circuit in *Planet III* found that one of Ventura Court's procedures was unconstitutional, but it *also found another was not*. *Planet III*, 947 F.3d at 600. Limited discovery and further briefing is necessary to understand the full picture of what is happening in Idaho state court.[10] Specifically, while mentioned in passing, the Court would like more briefing from both parties on the level of scrutiny to apply as part of its second-prong inquiry and whether Idaho's procedures constitute time, place, and manner restrictions.

The Court returns to its conclusion regarding Omundson's first argument: *Planet III* does not foreclose this lawsuit. The questions *within Planet III* will be adjudicated later.

Having concluded dismissal under Rule 12(b)(6) is not appropriate, the Court will next consider whether it should dismiss under principles of abstention.

### 3.  *Abstention Analysis*

In the second part of her Motion to Dismiss, Omundson suggests the Court should decline to exercise jurisdiction over this case under the principle of abstention.

"Federal courts have a strict, but not absolute duty to exercise the jurisdiction that is conferred upon them by Congress." *Courthouse News Serv. v. Gilmer*, 2021 WL 2438914, at *5 (E.D. Mo. June 15, 2021) (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)). "[F]ederal courts may decline to exercise their jurisdiction, in otherwise

---

[10] As will be explained below, the Court is not implying *substantial* discovery is needed in this case. However, at the motion to dismiss stage, the Court is unwilling to go outside the pleadings and make concrete findings on constitutionality based on potential factual disagreements between the parties.

'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest, for example, where abstention is warranted by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration.'" *Quackenbush*, 517 U.S. at 716 (cleaned up).

Here, Omundson argues that under *Younger v. Harris*, 401 U.S. 37 (1971), and its offshoots in *O'Shea v. Littleton*, 414 U.S. 488 (1974) and *Rizzo v. Goode*, 423 U.S. 362 (1976), the Court should decline to even hear this matter because it would invade the state of Idaho's purview.

Omundson argues there is a "split in the circuits on the issue of abstention raised by similar claims to those raised in this matter." Dkt. 7-1, at 5. She cites the Seventh Circuit's conclusion that abstention is "particularly appropriate" in these types of cases as courts "continue to transition to electronic filing and, like many courts across the country, are working through the associated implementation challenges and resource limitations." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1074 (7th Cir. 2018).

While this does illustrate one side of the split, the Court notes the "split" is heavily tilted against Omundson. Not only have many more courts *not* found abstention appropriate in these types of cases, but the Ninth Circuit has already soundly *rejected* the holding in *Brown* Omundson relies on:

> We disagree . . . with the Seventh Circuit's decision to abstain from resolving the dispute about when the right attaches and when delays are so long as to be tantamount to a denial of the right. *See Brown*, 908 F. 3d at 1070–75; *see also Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976); *O'Shea*, 414 U.S. 488.

*Planet III,* 947 F.3d at 591 n.4.

The *Brown* court itself recognized that none of the "principal categories of abstention" constituted "a perfect fit" and that it was basing its decision, instead, on "the more general principles of federalism." *Brown*, 908 F.3d at 1071.

Even then, the Fourth Circuit has joined the Ninth Circuit by recently noting that *Brown*'s approach "is inconsistent with . . . Supreme Court guidance." *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 325 (4th Cir. 2021). The Court here must agree.

In *Quackenbush*, the United States Supreme Court outlined when abstention was appropriate, and determined it was only necessarily in "exceptional circumstances where denying a federal forum would clearly serve an important countervailing interest." 517 U.S. at 716 (cleaned up). The Supreme Court went on to explain:

> Federal courts have the power to refrain from hearing cases that would interfere with a pending state criminal proceeding, or with certain types of state civil proceedings; cases in which the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law; cases raising issues intimately involved with [the States'] sovereign prerogative, the proper adjudication of which might be impaired by unsettled questions of state law; cases whose resolution by a federal court might unnecessarily interfere with a state system for the collection of taxes; and cases which are duplicative of a pending state proceeding.

*Id*. at 716–17 (cleaned up).

Omundson's position here (and the Seventh Circuit's position in *Brown*) flatly ignores more recent Supreme Court guidance emphasizing *Younger* abstention should not be applied "outside the[] three exceptional categories" outlined in *Quackenbush*, and that

"in accord[ance] with *NOPSI*,[11] [those categories] define *Younger*'s scope." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013).

And after *Sprint*, the Ninth Circuit has expressly held that abstention under *Younger* and its progeny

> is appropriate *only* when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges. If these 'threshold elements' are met, we then consider whether the federal action would have the practical effect of enjoining the state proceedings and whether an exception to Younger applies. Each element must be satisfied.

*ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014) (emphasis added) (cleaned up).

Here, no such circumstances exists. While the issues are *related* to state court proceedings in a somewhat colloquially sense because civil complaints are "legal proceedings," the acts of filing, accepting, and processing civil complaints are truly not "state proceedings" that trigger *Younger*.[12]

Finally, as part of her discussion regarding abstention, Omundson claims she does not have the authority to take any of the actions CNS suggests she take. She argues county

---

[11] In *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989) ("*NOPSI*"), the Supreme Court identified the three "exceptional circumstances" that authorize abstention under *Younger* and its progeny: (1) a case seeking federal intrusion into ongoing state criminal prosecutions, (2) a case seeking federal intrusion into certain "civil enforcement proceedings," and (3) a case seeking federal intrusion into pending "civil proceedings involving certain orders . . . uniquely in furtherance of the state court's ability to perform their judicial functions."

[12] Omundson argues that under *Sprint* (and other cases), the issues here implicate an important state interest, which also supports abstention. Be that as it may, Omundson is forgetting the qualifying condition that those interests be a part of "ongoing" state proceedings. There are no proceedings here. "We emphasize that federal courts cannot ignore *Sprint*'s strict limitations on *Younger* abstention simply because states have an undeniable interest" at stake. *Cook v. Harding*, 879 F.3d 1035, 1040 (9th Cir. 2018).

clerks—who are individually elected officials with varying job duties—are really those who have the power to do what CNS requests. The Court disagrees. While Idaho's county clerks are the "boots on the ground" with these issues, Omundson is, in her official capacity, responsible for the administration of Idaho's e-filing system.[13] Even were this not the case, the Court would allow amendment (as CNS offers to do) in order to join all forty-four of Idaho's county clerks. This seems hardly necessary.

In short, abstention is not applicable here and does not warrant dismissal. The Court declines to decline jurisdiction over this matter.

### 4. Conclusion

The Court finds that Omundson has not met her burden. Her two contentions in support of her Motion to Dismiss are that *Planet III* forecloses this case and that abstention should apply.

First, the Court finds that *Planet III* does not stand for the proposition asserted by Omundson. Now, it remains to be seen whether there are "delays" in this case and whether those delays are justified, but those questions are for later down the road and in no way support early dismissal.

Second, the Court takes its lead from the United States Supreme Court and the Ninth Circuit and finds that abstention does not apply in this case.

In sum, the Motion to Dismiss is denied.

---

[13] What's more, there is no indication that individual counites in Idaho were given the opportunity to opt out of the ICourts e-filing system. Said differently, this system was implemented (and is currently utilized) state-wide under Omudson's direction and purview.

**B. Motion for Preliminary Injunction**

The Court turns next to CNS's Motion for Preliminary Injunction. As alluded to above, while the Court is making certain findings today, it cannot go so far as to make others. Without some degree of certainty on those critical questions, it cannot enter a preliminary injunction at this time.

*1. Legal Standard*

The purpose of temporary injunctive relief is to prevent irreparable injury and to maintain the status quo pending a decision on the merits. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

A party seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Injunctive relief "is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

*2. Analysis*

a. Likelihood of Success

As noted, the applicable test for this case comes from the United States Supreme Court in *Press Enterprise II* and asks first whether the "proceeding or record ha[s] historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular [governmental] process in

question." *Planet III*, 947 F.3d at 590 (cleaned up). As noted, the parties in this case do not dispute the materials in question have historically been available to the public in Idaho and both agree that public access to these types of documents is important. Thus, there is a very high likelihood of success for CNS on this point.

The second question, however, is whether any restriction on that right "is essential to preserve higher values and is narrowly tailored to serve those interests." *Id.* at 595. As previously explained, this question remains unanswered. The parties must engage in some limited discovery and return to the Court upon a more complete record. The likelihood of success on this second prong, and thus the entire case, is unclear.

While the Court will not address the question of whether there are delays and whether those delays are unconstitutional, it must preliminarily address another point of disagreement: when the right to access attaches in the first place. The Court must do this now as this determination will ultimately regulate from what point to calculate any delay.

Trying to determine when CNS's right attaches turns on the definition of certain actions. Omundson contends that a civil complaint is not "filed" until court staff examines the pleading for compliance with court regulations and formally "processes" the document. She argues this is consistent with *Planet III*. CNS disagrees by pointing to the language in *Planet III* where the Circuit noted that the "right to timely access attaches at the moment of filing, *i.e., when the complaint is received by the court.*" *Planet III*, 947 F.3d at 588 (emphasis added). In other words, according to CNS, under *Planet III*, "filing" means the moment the documents cross over the desk (physically or electronically), *not* after they have been reviewed/scanned/approved by staff.

MEMORANDUM DECISION AND ORDER - 21

For support, CNS points to the final result in the Planet litigation: the district court's amended judgment declaring (1) that the "qualified right of timely access attaches when new complaints are received by a court, rather than after they are 'processed,'" and (2) that Planet's policy "requiring that newly filed complaints and their associated exhibits be 'processed' prior to providing the press and public with access to those complaints violates CNS's qualified First Amendment right of timely access to newly filed complaints." *Courthouse News Serv. v. Planet*, 2021 WL 1605216, at *1 (C.D. Cal. Jan. 26, 2021)

Omundson, however, points the Court to the district court's decision filed contemporaneously with the amended judgment that states, "*Planet III* did not address the distinction between 'filed' and 'received' because [the clerk] did not raise the issue, and so [the clerk] abandoned any objection." *Courthouse News Serv. v. Planet*, 2021 WL 1605218, at *4 (C.D. Cal. Jan. 26, 2021). For purposes of the judgment, the District Court adopted CNS's proposed language on the right of access attaching when complaints are "received by a court" but cautioned that "this Court's final judgment should still reflect the full extent of the Ninth Circuit's ruling, including those aspects that limit CNS's relief." *Id*.

Both parties also point to Idaho Rules for Electronic Filing and Service ("IREFS") in support of their respective positions. Omundson cites generally to IREFS 12 and avers that a "submitted document" is not the same as a "filed document." CNS also cites to IREFS 12 (among others) for the opposite conclusion.

One difficulty in the IREFS is that some rules use the word "file" as part of the definition of "file." For example, Rule 11 states, "A document will be considered *filed*

when: (1) the document has been electronically submitted to the court's electronic filing system; and (2) the submission has been acknowledged and the document accepted for *filing*." IREFS 11 (emphasis added). Under the first portion of Rule 11, it appears a document is filed upon submission. The second portion, however, muddies the waters by adding that the submission must be "acknowledged" and "accepted for filing" to be considered "filed."

CNS also points to Rule 2, and the definition of "Electronic filing" as "the process whereby a filer electronically transmits documents to a court in an electronic form to initiate an action or to be included in the court file of an action." IREFS 2(c).

Finally, CNS points the Court back to Rule 12, which discusses timing. In relevant part, Rule 12, subsection (1) explains: "For documents electronically filed, the date and time that the filer *submits* the electronic filing will serve as the filing date and time for purposes of meeting the statute of limitations or any other filing deadlines, *even if placed into an error queue for additional processing*." IFERS 12(1) (emphasis added). Unfortunately, subsection (2) goes on to say,

> If the document is *accepted* for filing, the date and time of filing entered in the register of actions relate back to the date and time the electronic filing system *received* the document. When the document *is accepted* for filing, the electronic filing system will affix the date and time of *submission* on the document *as the date and time of filing* of the document.

IFERS 12(2) (emphasis added).

Frankly, it seems that IREFS uses the word "filed" in two separate but related ways. First, it appears clear a document is considered "filed" once the submitting party hits the "send" button on his or her end and the submission is transmitted to the Court via the

MEMORANDUM DECISION AND ORDER - 23

electronic system. This conclusion is supported by Rule 2(c)'s "transmits" language; Rule 11(1)'s "electronically submitted" language; and Rule 12(1)'s language outlining the date and time of *submission* is used "*even if placed into an error queue for additional processing*." The phrase "additional processing" also seems to suggest that the quality control aspect Omundson relies on can happen *after* a matter is electronically submitted.

This aside, Rule 11(2) uses the word "filed" only after the qualifier "acknowledge" and Rule 12(2) uses the word "filed" after the phrase "is accepted." Now, whether "acknowledge" and "accepted" are meant to denote simple receipt (without human interaction via the E-filing system) or some more concrete form of acknowledgment or acceptance (like a clerk *deeming* the paperwork acceptable) is unclear. What's more, Rule 12(2) adds that "if" a document is accepted for filing (suggesting it isn't filed until something happens) the "filing date" relates back to when it was "filed" (i.e., when the electronic filing system received the document).

IREFS's unclear language notwithstanding—and leaving aside the District Court in *Planet III* noting that the Circuit did not formally address this matter—CNS argues that decisions rendered recently by other courts confirm that the "traditional definition" of filed is when the right to access attaches. *Courthouse News Serv. v. N.M. Admin. Off. of the Cts.*, 2021 WL 4710644, at *39 (D.N.M. Oct. 8, 2021), appeal filed (10th Cir. Oct. 29, 2021) (quoting *Planet III*, 947 F.3d at 594); *accord Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *13, (D. Vt. Nov. 19, 2021), appeal filed (2nd Cir. Dec. 21, 2021).

The Court is inclined to agree with CNS—and other courts—that "filed" is best understood to mean when the complaint is submitted to the respective e-filing system, *not*

to mean once the documents are reviewed/accepted/processed by a clerk. The moment of submission triggers the date and time to be affixed for procedural purposes. IREFS 12. And such is the case even if further processing is required. *Id.*

The Court thus finds that "filed" is equivalent to submission. However, that does not mean the Court is finding "filed" is equivalent to *immediate* access. Again, this might be viewed as a distinction without a difference, but it is not. As CNS notes—and in accordance with *Planet III*—it never sought "immediate" access to court records (in this case or any others). It simply contends that the current schema in Idaho, with its associated delays, cannot be justified. The above conclusion regarding "filed" is, therefore, important, because the Court's inquiry later in this case will be whether Omundson's procedures are "essential to preserve higher values and [are] narrowly tailored to serve those interests" or if they cannot be justified. *Press-Enterprise II*, 478 U.S. at 13–14. When the clock starts ticking is relevant in determining whether Omundson's procedures are justified.

In sum, while CNS enjoys a high likelihood of success on the first *Press Enterprise II* element—after all Omundson does not contest the materials have historically been accessible and are relevant—it is not clear CNS will prevail on the second element under *Press Enterprise II*. The Court can appreciate both sides' positions at this point. However, the Court cannot find, even preliminarily, for either party. Such uncertainty weighs against a preliminary injunction.

b. Irreparable Harm

CNS argues that any loss of a First Amendment freedom constitutes irreparable injury and weighs in favor of an injunction. The Court does not dispute this general

statement. That said, the Court does not know if there has been a First Amendment loss here or not. It has not yet determined whether the delays caused by the Omundson's procedures are so onerous as to constitute constitutional deprivations.

Omundson agrees, even at this early stage, that there are some delays under Idaho's current system from the time a Complaint is submitted to when it becomes available to the press and public. However, in her mind, the delay is insignificant, a necessary part of the process, not irreparable and not unconstitutional.

Whether there is irreparable harm to CNS here is difficult to determine. That conclusion, again, rests on the second prong of the *Press-Enterprise II* test and the Courts conclusion on the constitutionality of any delays.

Interestingly, the Court finds harm could result *for Omundson* were the Court to grant an injunction at this time. For example, if the Court granted the injunction—effectively telling Idaho state courts they needed to change procedures immediately—*but* later determines the minor delays under the current procedures are constitutional, Idaho would have incurred substantial cost, time, and energy changing a system that did not need to be changed.[14] CNS is quick to note that the Omundson does not have to take its suggested approach of using the press review feature from Tyler and could either build a program internally to remedy the delays or figure out another workaround. While true, *in any*

---

[14] For example, Omundson claims that were it to ask Tyler Technologies to reconfigure its Odyssey program to do what CNS asks and have the "press review queue" feature, it would cost $108,000. CNS contends this quote is highly suspect because Tyler has implemented the exact same program with many of its existing customers *for free*. The resolution of this disagreement would affect the question under *Press-Enterprise II* of whether Idaho has any reasonable alternatives it can use to protect the interest it seeks to protect via its procedures.

*scenario*, the State could be incurring cost and time that is ultimately unnecessary.

To be sure, the question regarding injury looks to CNS, as opposed to Idaho, but this principle dovetails into the remaining *Winter* factors.[15] What's more, while assuredly not dispositive, the Court notes that CNS *did not* file its motion for preliminary injunction at the outset of this case (rather, it was four months later) nor did it request expedited briefing or an expedited hearing. Thus, it would appear that any alleged harm is at least manageable under the current circumstances.

c.  Balance of Equites and Public Interest

The Court finds it is not equitable at this stage to force Idaho to overhaul its entire legal filing system. Again, CNS's point is well taken that any delay in access is access denied—particularly in a fast-paced environment such as news reporting. However, Omundson's point is also well taken that orderly filing and administration causing minor delays is not automatically unconstitutional. Afterall, such was the holding in *Planet III* as applied to one of Ventura County's processes.

In like manner, while the public has an interest in undelayed access to newsworthy civil filings, it also has an interest in the orderly administration of justice and ensuring the proper use of tax-payer funds.

d.    Conclusion

Ultimately, the Court cannot say whether CNS has a likelihood of success on the merits of its case because the Court does not know how the pivotal question of

---

[15] As is the situation in most preliminary injunction briefing, both parties focused almost exclusively on the first question—likelihood of success—and essentially lumped the remaining considerations together.

constitutionality will unfold. Because of this, the Court is also unwilling to force Omundson (and Idaho) to undertake potentially lengthy and/or costly changes until it knows such are necessary. Upon review, and weighing all the *Winter* factors, the Court cannot grant a preliminary injunction at this time.

## V. CONCLUSION

Omundson's Motion to Dismiss is DENIED. She is incorrect in her assertion that *Planet III* forecloses this case outright. Additionally, the Court joins other district courts—in conformity with the Ninth Circuit's holding—and finds abstention is inapplicable here. For these reasons, dismissal in inappropriate.

The Court cannot, however, grant CNS's Motion for a Preliminary Injunction at this time either. The outcome of *Press Enterprise II*'s critical second question—regarding the constitutionality of any delay—cannot be determined at this early stage, even preliminarily. The Court has provided some initial rulings and guidance, but discovery is necessary to bring this fully before the Court for resolution. What's more, the remaining *Winter* factors are roughly even. Ultimately, the Court finds a preliminary injunction is not warranted.

## VI. ORDER

1. Omundson's Motion to Dismiss (Dkt. 17) is DENIED.

2. CNS's Motion for Preliminary Injunction (Dkt. 14) is DENIED.

3. The Court is of the opinion that this case is somewhat unique when it comes to discovery. It likely does not need the typical 9–12 months to reach a summary judgment posture. The Court will send out its standard litigation notice requiring that the parties meet and confer on a proposed schedule and encourages the parties

to tailor discovery to the needs of this case. The Court *recommends* a few months of discovery and then briefing on summary judgment.

DATED: April 14, 2022

David C. Nye
Chief U.S. District Court Judge