UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| COURTHOUSE NEWS SERVICE, | Case No. 1:21-cv-00305-DCN |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| SARA OMUNDSON, in her official capacity as Administrative Director of Idaho Courts, | |
| Defendant. | |

## I. INTRODUCTION

Before the Court are the parties' cross-motions for summary judgment. Dkts. 60, 61. Defendant Sara Omundson also filed a Motion to Seal (Dkt. 58), and, as part of the briefing on that motion, Plaintiff Courthouse News Service ("CNS") filed a Motion for Leave to File Sur-Reply (Dkt. 77).

The Court held oral argument on July 10, 2023, and took the matters under advisement. Upon review, and for the reasons outlined below, the Court GRANTS the Motion for Leave to File Sur-Reply (Dkt. 77), GRANTS in PART and DENIES in PART the Motion to Seal (Dkt. 58), DENIES Omundson's Motion for Summary Judgment (Dkt. 60) and GRANTS CNS's Motion for Summary Judgment (Dkt. 61.)

## II. OVERVIEW

While this is a difficult case, the issues boil down to two basic questions. First, under the First Amendment, at what point in time can CNS expect access to newly-filed civil complaints in Idaho state court? And second, does the review process Omundson currently uses inhibit CNS's right of access?

The Court has researched the issues involved in this case extensively. Notably, CNS has pursued—and is currently pursuing—claims like those at issue here throughout the United States. And generally speaking, CNS has found success in its pursuit.

Many district courts have ruled in CNS's favor. *See, e.g., Courthouse News Serv. v. Forman*,[1] 606 F. Supp. 3d 1200 (N.D. Fla. 2022), (ruling in CNS's favor because defendant's "filing system frustrates the press and public's right to monitor their local judiciary" and infringes CNS's First Amendment rights) *appeal dismissed sub nom. Courthouse News Serv. v. Broward Cnty. Clerk*, 2022 WL 9643634 (11th Cir. Sept. 6, 2022); *Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *18 (D. Vt. Nov. 19, 2021) (enjoining the state of Vermont from "delaying public access to electronically filed civil complaints until the [] Courts' pre-access review process is complete"); *Courthouse News Serv. v. Jackson*, 2009 WL 2163609, at *5 (S.D. Tex. July 20, 2009) (granting CNS's motion for injunctive relief).

Some of those cases have been affirmed on appeal. *See, e.g., Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 329 (4th Cir. 2021) (affirming the district court's finding that

---

[1] Because the case names of these suits are similar—e.g., Courthouse News v. [Defendant]—and to avoid confusion, the Court will typically use the full citations even when a "short cite" would be permissible.

CNS's First Amendment rights had been violated when the defendants did not make newly-filed complaints available "contemporaneously"—defined loosely as the same day as filing). But others have not. *See, e.g., Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1273 (10th Cir. 2022) (holding the district court erred in granting CNS's motion for preliminary injunction and imposing a bright-line, five-business-hour rule for when complaints needed to be made public).

Some courts have ruled in CNS's favor, but on more limited grounds. *See, e.g., Courthouse News Serv. v. Planet*, 947 F.3d 581, 594 (9th Cir. 2020) (finding some procedures unconstitutional and others constitutional).

Still other courts have decided the question is fact driven and must proceed to trial. *Courthouse News Serv. v. Cozine*, 2023 WL 6891322, at *6 (D. Or. Oct. 19, 2023) ("Because the Court finds that Defendant has shown genuine issues of fact for both parts of the *Planet III* balancing test, summary judgment in Plaintiff's favor is not appropriate. Plaintiff's First Amendment claim will proceed to trial.").[2]

Finally, some courts have stayed similar CNS cases in the hopes of settlement. *Courthouse News Serv. v. Harris*, No. CV ELH-22-0548, Dkt. 109 (D. Md. May 21, 2024) (granting joint motion to stay so parties could pursue settlement negotiations).

The varying outcomes of these cases is not surprising considering that each turns on the specific state statutes, filing rules, and court procedures at issue and whether each is constitutionally sufficient under the First Amendment. Nevertheless, the underlying

---

[2] The day before trial was set to begin on September 12, 2024, the parties settled. *Courthouse News Serv. v. Cozine*, Case No. 3:21-cv-00680-SI, Dkt. 158.

analysis in each of those decisions relates to principles at play in this case and has caused the Court great consternation. There is a difficult balance here. On the one hand, nobody disputes (not even Omundson) that CNS should have access—and quick access at that—to newly filed civil lawsuits for news reporting purposes. On the other hand, everyone agrees (even CNS) that some type of review is necessary for organizational and clerical purposes. Ultimately then, the problem is timing. When does CNS's right to this information attach? And when does Omundson get to undertake her review?

CNS has a right under the First Amendment to access the information it seeks. It candidly recognizes this right is not "immediate." But it also counters the right cannot be "delayed" either. Omundson's process includes some "delay"—at least by common parlance. Thus, the Court must resolve whether the delays stemming from Omundson's review process infringe CNS's constitutional rights. Under the circumstances, the Court finds Omundson's process does infringe CNS's rights. Accordingly, summary judgment is entered in favor of CNS and against Omundson.

### III. BACKGROUND

#### A. Factual Background

CNS is a nationwide news service founded more than thirty years ago to provide coverage of civil lawsuits. It offers a variety of publications to thousands of subscribers across the United States. The publication covering Idaho courts is *The Big Sky Report*, written by Boise-based reporter Cathy Valenti. *The Big Sky Report* includes news about civil complaints filed in Idaho, Montana, and Wyoming, with its primary focus on actions involving businesses and public entities.

Omundson is the Administrative Director of Idaho Courts and, in her official capacity, is responsible for the administration of Idaho's e-filing and public access system—Odyssey or "iCourts"—that is used statewide by courthouses in each of Idaho's 44 counties.

As noted, the crux of this lawsuit centers on the timeliness of CNS's access to newly filed civil complaints in Idaho state court. As it currently stands, when a civil complaint is filed in Idaho, there is a short review county clerks undertake before the case is accessible to the public. This review includes checking for the following: (1) the required case information sheet has been submitted; (2) a certification of service was completed and is included; (3) the caption contains party names; (4) filing fees are paid and paid in the correct amount; (5) the document includes required signatures; and (6) the proper Magistrate division of the District Court has been selected (if applicable). *See* Dkt. 20-14, at 3.

The parties agree the aforementioned process takes roughly five minutes. The bigger problem is the time it takes staff to get to the review process in the first place.

CNS argues Omundson and her staff take too long, and the resulting delay infringes on its First Amendment right of access. Omundson asserts any delay is minimal and does not infringe any Constitutional rights.

### B. Procedural Background

At the outset of this litigation, Omundson filed a Motion to Dismiss. Dkt. 7. Therein, Omundson argued that CNS had not stated a claim upon which relief could be granted and, alternatively, that the Court should decline to exercise jurisdiction over this case based

upon principles of abstention. CNS opposed Omundson's Motion to Dismiss and filed a Motion for Preliminary Injunction alleging the Court should enjoin Omundson from continuing to delay its access to newly filed civil complaints. Dkt. 14.

Ultimately, the Court denied both motions. Dkt. 40; *Courthouse News Serv. v. Omundson*, 598 F. Supp. 3d 929 (D. Idaho 2022). The Court summarized its decision as follows:

> Omundson's Motion to Dismiss is DENIED. She is incorrect in her assertion that *Planet III* forecloses this case outright. Additionally, the Court joins other district courts—in conformity with the Ninth Circuit's holding—and finds abstention is inapplicable here. For these reasons, dismissal in inappropriate.
>
> The Court cannot, however, grant CNS's Motion for a Preliminary Injunction at this time either. The outcome of *Press Enterprise II*'s critical second question—regarding the constitutionality of any delay—cannot be determined at this early stage, even preliminarily. The Court has provided some initial rulings and guidance, but discovery is necessary to bring this fully before the Court for resolution. What's more, the remaining *Winter* factors are roughly even. Ultimately, the Court finds a preliminary injunction is not warranted.

*Id*. at 946. As alluded to, a two-prong test is at issue in this case. The Court previously found that CNS had meet the first prong of the test, but that discovery was necessary to flesh out the issues relative to the second prong. Discovery has come to an end, the parties have filed cross-motions for summary judgment on the remaining issue, and the Court held oral argument on the same.[3] The matter is ripe for adjudication.

---

[3] As part of her Motion for Summary Judgment, Omundson asks the Court to revisit its ruling on the first issue arguing information obtained during discovery shows the Court's analysis is incorrect. This aside, the primary focus of the parties' discovery and briefing relates to the second prong of the test.

# IV. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (cleaned up). Importantly, the Court does not make credibility determinations at this stage of the litigation. Such determinations are reserved for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992).

In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Zetwick*, 850 F.3d at 441. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (cleaned up). Accordingly, the Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

The standard applicable to motions for summary judgment does not generally

change if the parties file cross motions. *See, e.g.*, *Cady v. Hartford Life & Accidental Ins.,* 930 F. Supp. 2d 1216, 1223 (D. Idaho 2013). However, the Court must evaluate each party's motion on its own merits. *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## V. DISCUSSION

Before diving into the substance of the Parties' competing Motions for Summary Judgment, the Court must address some procedural issues.

### A. Motion to Seal and Motion to File Sur-Reply (Dkts. 58, 77)

On December 15, 2022, the parties filed their Motions for Summary Judgment. Dkts. 60, 61. In conjunction with her Motion for Summary Judgment, Omundson filed a Motion to Seal. Dkt. 58. Therein, she asked the Court to allow her to file certain documents in support of her Motion for Summary Judgment under seal. *Id*. Those documents include the Declaration of Terry Derrick,[4] the Declaration of Sara Omundson, the Declaration of Jennifer Dvorak, Volume I of the transcript of the deposition of Terry Derrick (Exhibit G to the Declaration of Keely Duke), and Volume II of the deposition of Terry Derrick (Exhibit F to the Declaration of Keely Duke).

In response to Omundson's Motion to Seal, CNS argued Omundson had not met her burden establishing why the documents needed to be filed under seal but averred it would work with her to resolve the issues to avoid further motion practice. Dkt. 68.

In reply to her own motion, Omundson affirmed the parties were able to reach

---

[4] Terry Derrick is Tyler Technologies' 30(b)(6) deponent. Tyler Technologies developed the Odyssey software suite Idaho utilizes for case filing.

agreement on two of the documents—the Declaration of Dvorak and the Declaration of Omundson—and that, as a result, she would file redacted versions of those documents for the public record. Dkt. 73. She then noted the parties remained at odds on whether the items related to Derrick should be sealed. *Id*.

CNS then filed a Motion for Leave to File Sur-reply to clarify Omundson's representations about the parties' negotiations. Dkt. 77. It explained that, despite the parties' agreement, Omundson never filed redacted versions of the two documents as promised. *Id*. It also maintained anything related to Derrick need not be filed under seal.

Omundson opposed CNS's request to file a sur-reply, contending there is no such mechanism in federal court. Dkt. 81.[5] She further stated that the redacted documents *were* filed under seal as Dkts. 75-12 and 75-13. *Id*. The parties later clarified at oral argument that the documents in question are actually filed at Dkts. 78-1 and 78-2. Regardless, the parties agree the redacted versions are now in the public record and there is no evidentiary dispute as to the Declaration of Dvorak and the Declaration of Omundson. The sealed and redacted copies in the record as to those documents shall stand.

The bigger issue is what to do with the documents related to Terry Derrick—third-party Tyler Technologies' 30(b)(6) deponent. CNS argues Omundson has not met her

---

[5] Omundson is generally correct. However, the Court has allowed sur-replies in the past. As the Court has explained, "[w]hile the Federal Rules of Civil Procedure do not expressly permit the filing of a sur-reply, this Court has recognized that a reply brief may justify a sur-reply in appropriate circumstances." *Ocampo v. Corizon*, LLC, 2019 WL 1495251, at *3 (D. Idaho Apr. 4, 2019). Leave to file a sur-reply is discretionary but should be granted "where a valid reason for such additional briefing exists," such as when the movant raises new arguments in its reply brief. *Hill v. England*, 2005 WL 3031136, at *1 (E.D. Cal. Nov. 8, 2005). Here, it does appear CNS was responding to arguments first raised in Omundson's reply. While those arguments were more procedural (about the parties' communications) as opposed to substantive, the Court will accept the sur-reply and give it the weight it deems appropriate in sorting out this matter.

burden of establishing exactly why these documents should be filed under seal. Omundson explains her argument is short because the argument is simple. According to Omundson, Tyler Technologies had expressed *its* understanding that Derrick's testimony and declaration were subject to the protective order in this case because both documents include confidential and proprietary information. As a result, *Tyler Technologies' counsel* asked that the documents be filed under seal as part of the summary judgment proceedings. Omundson explained at oral argument that she was simply trying to honor Tyler Technologies' concerns.

Notably, Tyler Technologies did not designate any portions of Derrick's deposition testimony as confidential. Additionally, an *unredacted* version of Derrick's testimony is already in the record. *See* Dkt. 67-1, at 62–122. Thus, while the Court appreciates that some of the information is confidential and/or related to Tyler Technologies' business practices, the fact that it did not actually designate anything specific as confidential and/or move to redact or seal the deposition already publicly available in the record renders the issue essentially moot. Accordingly, Dkts. 59-2, 59-5, and 59-6 shall be unsealed.

A final procedural matter: as part of summary judgment, and pursuant to local rule, Omundson filed a 27-page Statement of Undisputed Facts. Dkt. 60-1.[6] CNS filed a 23-page response to Omundson's Statement of Undisputed Facts. Dkt. 76. As part of its Response to Omundson's Motion for Summary Judgment, CNS also filed a 58-page "Appendix" outlining its "objections to evidence submitted by [Omundson] in support of her motion

---

[6] CNS filed a 17-page statement of undisputed facts in conjunction with its Motion for Summary Judgment. Dkt. 61-2.

for summary judgment." Dkt. 74-3. Omundson then filed a 7-page response to CNS's Appendix. Dkt, 79-1.

Local Rule 7.1(c)(2) outlines that ". . . the responding party must also file a separate statement, not to exceed ten (10) pages, of all material facts which the responding party contends are in dispute." Because CNS's response to Omundson's Statement of Undisputed Facts exceeds the local rule's limit by 13 pages, Omundson asked the Court to either strike the document or require CNS to refile a shorter document in conformity with local rule. If the latter, Omundson asked for leave to file a short sur-reply. Furthermore, while acknowledging that CNS can file whatever it likes (such as an appendix of objections), Omundson argues this extra document is really a ruse to get around the 10-page limit on statements of disputed facts (even though CNS already exceeded it by 13 pages) and that the appendix should be stricken as well.[7]

The Court discussed this matter with counsel at the hearing. As it indicated at that time, the Court will allow all documents to stand. It appears there was some confusion regarding a stipulation between the parties and how it applied to page lengths. There were also some procedural anomalies as to how these documents came before the Court. Regardless, the important thing is all arguments are squarely before the Court for adjudication.

Finally, CNS's appendix of objections and Omundson's request to strike the same requires more attention and analysis.

---

[7] This argument notwithstanding, as noted, Omundson also filed a formal response to CNS's appendix. Dkt. 79-1.

The commentary in Rule 56 of the Federal Rules of Civil Procedure makes clear that, while a party can object to "material cited to support or dispute a fact," because it "cannot be presented in a form that would be admissible,", there is "no need to make a separate motion to strike." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment. Instead, the party should file an objection and then "the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id*.

Despite this direction, the Court constantly reviews motions to strike where the parties strive to do just that: strike material offered in support of, or against, summary judgment. Thus, because motions to strike are disfavored, the Court has outlined that any objections should be raised as part of briefing itself or in a separate appendix. *See* https://id.uscourts.gov/district/judges/nye/Motion_Practice.cfm. Candidly, this is the first time a party has utilized the Court's "appendix" suggestion. And the Court is not implying CNS's appendix was improperly filed; it is simply long. At 58 pages—and containing 45 separate objections—it is actually longer than most of the underlying briefs. Additionally, CNS has included arguments in its appendix. Again, there is nothing inherently wrong with doing so, as the Court would expect CNS to explain its objection(s). But the Court's point is that the purpose of the appendix—to avoid prolonging the case as often occurs when motions to strike are filed—did not really occur here because Omundson responded (as she would have if a motion to strike had been filed) and it took the court substantial time to review the materials (again as it would have with a motion to strike). So, while CNS's methodology here was procedurally proper, it did not save the Court or counsel time as

compared to a Motion to Strike.

That said, many of the objections boil down to a repeating single objection, but associated with different people.[8] Thus, for organizational purposes, the Court will group similar objections together while also addressing others individually.

CNS's first objection relates to Omundson's statements regarding certain functionalities of the Odyssey filing system. Dkt. 59-7, at 8–9. CNS alleges Omundson is not an expert on that system and that her opinion lacks foundation. Dkt. 74-3, at 1–3. In response, Omundson agrees she is not an expert, but contends she is not providing an expert opinion, but rather her own observations of how the system operates. The Court agrees that Omundson's personal observations and opinions are not expert opinions. To be sure, Omundson oversees Idaho's e-filing system, but just because she shares her personal knowledge and opinion on a matter does not render those opinions "expert" opinions. *See Richbourg v. Jimerson*, 2013 WL 3336167 (D. Ariz. 2013) (rejecting argument that affidavit testimony from employees was improper expert testimony under Rule 702). The Court will not strike this testimony.

CNS's second objection relates to Omundson's opinion that public confidence could "erode" if a Press Review Queue[9] is utilized. Dkt. 59-7, at 9. Multiple other individuals expressed this same sentiment—*see, e.g.,* Dkts. 60-26, at 5; 60-28, at 12; 60-

---

[8] By way of explanation, Omundson filed almost twenty declarations from Idaho state judges and court staff in support of her Motion for Summary Judgment. While the documents are not identical, they are very similar in nature and contain similar wording. Thus, the statements that CNS objected to are, more or less, uniform amongst all the declarants.

[9] A "press review queue," is a feature Tyler Technologies offers which allows the press to view submitted documents *prior* to administrative or clerical review.

30, at 5—and it serves as the basis for objections 2, 8, 9, 13, 17, 20, 32, 37, and 45 in CNS's appendix. CNS alleges this statement is speculative and lacks foundation. While it is speculative whether the public's confidence could erode if certain things happen within the Odyssey system, these individuals are just expressing their opinion that this erosion would occur. As a result, this is a question of weight, not admissibility, and is better dealt with at trial. *See Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013) (explaining that challenges to lay witness testimony and opinion go to the weight of the evidence and are "an issue for trial, not summary judgment."). Moreover, while this testimony does not specifically go to the heart of the matters at hand, even if it did, such would still likely be allowed. *See U.S. v. Christensen*, 2016 WL 1158893, at *2 (D. Ariz. Mar. 24, 2016) (noting that "lay opinion testimony is not inadmissible solely because it addresses the ultimate issue in the case"). Regardless, the Court will not strike these statements.

CNS's third and fourth objections concern two news articles Omundson submitted in support of her Motion for Summary Judgment. Dkts. 60-11, 60-12. These news articles detail a data breach in the Odyssey system that occurred in California and resulted in the inadvertent publication of confidential material. CNS claims these documents are hearsay and lack authentication. Dkt. 74-3, at 3–6. To begin, news articles such as those at issue are self-authenticating. *See Jarritos, Inc. v. Reyes*, 345 F. App'x 215, 218 (9th Cir. 2009) (explaining that "printed materials purporting to be newspapers or periodicals" are self-authenticating and holding it was erroneous for trial court to exclude magazine article for lack of authentication and foundation). Second, these documents are not hearsay. They are not being cited for the proposition that a data breach occurred, but simply to illustrate that

the Odyssey system has potential flaws. The Court will not strike this testimony.

The next group of objections relates to multiple declarants' statements that "judicial action would be required to address improperly submitted documents . . . ." *See, e.g.,* Dkt. 60-26, at 3; Dkt. 60-31, at 23, Dkt. 60-34, at 2. CNS contends—in objections 5, 10, 11, 14, 15, 18, 19, 21, 22, 25, 28, 29, 30, 35, 36, 38, 40, 41, 43, and 44—that these statements are "unsupported opinions" and should not be considered. As with the Court's above observations about opinion statements, at this stage of the case, the Court will allow these opinion statements to stand. Each statement is simply the declarant's opinion based upon his or her experience with the state of Idaho's judicial system. Rule 701(a)'s personal knowledge requirement is met here because these individuals necessarily drew on his or her own understanding and experience with the state of Idaho's judicial system and how Odyssey is utilized. *See United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014). Thus, there is requisite knowledge—but not impermissible expert knowledge—and support behind these statements and the Court will allow them to stand.

The final group of objections is similar to the above and relates to statements that certain Odyssey features would "increase the workload" of judges and staff in Idaho's courthouses. *See, e.g.,* Dkt. 60-31, at 3; Dkt. 60-32, at 3; Dkt. 60-34, at 2. CNS again objects—in objections 6, 7, 12, 16, 23, 26, 27, 31, 33, 34, 39, and 42—on the basis that such opinions are speculative. To repeat, like all the opinion statements CNS to which objects, the objection is noted, but overruled because the issue is one of weight and not admissibility.

In sum, Omundson's Motion to Seal is GRANTED in PART and DENIED in

PART, as outlined above. The documents already under seal (with redacted versions) shall remain under seal *except* Dkts. 59-2, 59-5, and 59-6 shall be unsealed. CNS's Motion for leave to File Sur-Reply is GRANTED. The objections in CNS's appendix are OVERRULED as outlined above.

### B. Motions for Summary Judgment (Dkts. 60, 61)

As previously discussed at length in the Court's prior decision, the heart of this case takes its lead from a line of cases out of California and the Ninth Circuit referred to as the "*Planet* trilogy." *See Omundson*, 598 F. Supp. 3d at 935–38. The Court will not recount that story, and lengthy legal history, here. Nevertheless, the Ninth Circuit's decision in *Courthouse News Service v. Planet* ("*Planet III*") provides the applicable standard for evaluating whether a court's administrative procedures violate the media's "right of timely access to newly filed nonconfidential complaints." 947 F.3d 581, 585 (9th Cir. 2020).

Based on the leading Supreme Court authority on court record access, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"), the Ninth Circuit in *Planet III* established a two-step framework for evaluating claims such as those brought by CNS in this case.

Under the first step, a reviewing court must determine whether "the qualified First Amendment right of access" exists as to the judicial records in question and "relatedly, at what point in time that right attaches." *Planet III,* 947 F.3d at 590. In making this determination, a court considers various factors including, "(1) whether that proceeding or record 'ha[s] historically been open to the press and general public' and (2) 'whether public access plays a significant positive role in the functioning of the particular [governmental]

process in question.'" *Id.* (quoting *Press-Enterprise II,* 478 U.S. at 8). If both factors are evident, a qualified First Amendment right of access attaches to the implicated judicial records.

Under the second prong, the reviewing court then considers whether any restrictions on that right are "essential to preserve higher values" and "narrowly tailored to serve those interests." *Id.* at 595 (quoting *Press-Enterprise II*, 478 U.S. at 13–14).

The Court will address each factor in turn.

*A.  Judicial Records*

As noted, the Court already determined the first question from *Press-Enterprise II.* Or so it thought.

In its decision on the parties' prior motions, the Court noted that, "like the parties in *Planet III*, the parties in this case do not dispute the materials in question have historically been available to the public in Idaho and both agree that public access to these types of documents is important." *See Omundson*, 598 F. Supp. 3d at 937–38. The Court went on to note the main dispute, therefore, was "*when* this right attaches and whether any delays in 'processing' are acceptable." *Id.* at 938 (emphasis added).

Omundson now asks the Court to reconsider its prior position on this first question. Simply put, Omundson now claims the public *has not* had historic access to the documents CNS is trying to access. Or at least, it has not had access within the timeframe everyone originally thought.

This, unfortunately, throws the Court back into the murky waters of when a document is "filed" in Idaho state court.

MEMORANDUM DECISION AND ORDER - 17

From the outset of this case, Omundson has taken the position that, because there are administrative rules discussing when a civil complaint is "accepted," the First Amendment right of access does not attach in Idaho until after a county clerk "processes" and "accepts" a civil complaint for filing. For its part, CNS has followed the language of *Planet III*'s holding "the right to timely access attaches at the moment of filing, i.e., when the complaint is received by the court." 947 F.3d at 588. "[W]e conclude, as did the district court, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court . . . ." *Id*. at 594.[10]

The Court previously waded into this issue and, after analyzing various state court filing rules, determined that: "'filed' is best understood to mean when the complaint is submitted to the respective e-filing system, *not* to mean once the documents are reviewed/accepted/processed by a clerk." *Omundson*, 598 F. Supp. 3d at 944.

Omundson contends that the Court's reasoning is flawed because discovery revealed that reporters *historically* did not have access to complaints the minute they were filed—as originally claimed by CNS. Rather, reporters only had access once the civil complaints had been "accepted" by the clerk, file-stamped, and entered into the computer system. Omundson claims that until this process is complete, the documents are not judicial

---

[10] The underlying facts surrounding this argument come from CNS's complaint where it states reporters previously (before e-filing) would go to courthouses in Idaho and could view newly-filed cases in a "media box, bucket, or cart" and that they could access these documents "regardless of whether the complaints had been docketed [] or processed . . . ." Dkt. 1, at 11. In discovery, however, it became clear that the documents in the "box, bucket, or cart" had been file-stamped—meaning the "basic, ministerial review had been done" even though the case hadn't been placed into the "physical file yet." Dkt. 85, at 16. Omundson claims the language from CNS's complaint is, therefore, false, and that this clarification from discovery and testimony bolsters its argument that the access CNS has now is the same as it has always had—that of complaints *after* an administrative review has taken place.

documents, and nobody has any type of First Amendment right to them.

CNS counters that Omundson's view is not only contradictory to the Court's prior ruling, but it contradicts other Court rulings as well. For example, since the Court's prior ruling in this case, the Tenth Circuit has had an opportunity to address this issue. It too found that "the First Amendment right of access attaches to complaints when the court *receives* them, regardless of the technical terms and clerical processes used by the court." *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1262 (10th Cir. 2022).

Never dissuaded, Omundson counters that county clerks in Idaho are not officially "receiving" anything until they have reviewed and processed the filings and so their processes still conform with the "receiving" language of the Tenth Circuit.

The Court sees Omundson's point. This is a difficult question. But, respectfully, Omundson has a retort for everything. Omundson initially took the position that lawsuits are not "filed" until court staff reviews and "processes" the documents. But in its prior decision, the Court found "filed" means "submitted." Omundson's response then turned slightly and focused on the idea that documents are not "submitted" until they are "accepted" by court staff. And then when faced with the Tenth Circuit's analysis that "receipt" is essentially acceptance, Omundson pivoted again, now asserting documents are not really "received" until they are "processed" or "reviewed."

The Court does not fault Omundson for seeking to relitigate this issue. First, as the Court already noted, this question turns on "unclear language," and different—sometimes incongruent—uses of the word "filed" in various Idaho court rules. *Omundson*, 598 F.

Supp. 3d at 944. Second, if Omundson prevails on this prong, then CNS's case crumbles. Said another way, if the Court were to agree that the First Amendment right of access does not attach until lawsuits are filed, and "filed" does not occur until after all the processing and review steps have happened (per Omundson's definition), then access is basically instantaneous when cases are filed, there is no delay, and CNS has no complaint.

The Court, however, cannot accept Omundson's position (and will not revise its prior finding) for the following reasons.

First, Omundson's argument creatively puts any delay in the process *before* filing. Said differently, if filing isn't defined until the very end of the process, then a case could be uploaded to the Odyssey system and sit for an undetermined period of time while various processes and procedures are completed before it is actually "filed," and any right of access has actually been created. This stands in contrast to the spirit of the First Amendment's right to access.

Second, and more importantly, Omundson's interpretation is contradictory to Idaho's Rules for Electronic Filing and Service ("IFERS"). As the Court previously analyzed at length, Rule 12 mandates that the current date and time when a document is *submitted* is affixed and will serve as the date and time for statute of limitations purposes *even if additional processing is necessary. See* IFERS (12)(1). Thus, it appears clear that the filing or submission occurs at the outset (i.e. the moment the sender hits send and the document lands in Odyssey). Now, as the Court also already lamented, the next section of IFERS goes on to explain that if the document is then "accepted for filing"—seeming to indicate filing is *not* complete upon submission—the prior date and time will stand. *Id*. But

MEMORANDUM DECISION AND ORDER - 20

IFERS goes on to explain that when corrections are needed, a filer has "3 business days" from the date it received notice of the error in which to correct the mistake. IFERS 13(b). And, as part of any corrective filing, that party may "request . . . that the date of *filing* of the resubmitted document relate back to the date of *submission* of the original document to meet *filing* requirements." IFERS 13(c) (emphasis added). Again, the overlapping usage of terms such as "submit," and "file" leave much to be desired.

The Court appreciates the gravity of the situation. But it does not think mental gymnastics or creative arguments about semantics are necessary. The "traditional" definition of "filed" suffices. As the Tenth Circuit noted, no Court has yet to hold that "the right of access attaches at the point of acceptance" as opposed to the point of "submission." *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.,* 53 F.4th 1245, 1266 (10th Cir. 2022).[11]

In sum, the Court will not revisit its prior ruling. "'[F]iled' is best understood to mean when the complaint is submitted to the respective e-filing system, *not* to mean once the documents are reviewed/accepted/processed by a clerk. *Omundson*, 598 F. Supp. at 944.

That said, the Court must briefly touch on the "experience and logic" test set forth by *Press-Enterprise II* for determining whether CNS has a historical right to these types of materials in general. *See* 478 U.S. at 9.

---

[11] The Tenth Circuit also noted that an unwieldy focus on terminology could lead to court administrators "adopting administrative rules that define a document as 'filed' much later in the judicial review process . . ." in an attempt to circumventing the media's First Amendment right of access. *Courthouse News Serv. v. New Mexico Admin. Off. of Cts.,* 53 F.4th 1245, 1267 (10th Cir. 2022) (cleaned up).

Omundson argues that the "historical" question hinges on the *timing* of CNS's historical access. The Court disagrees because doing so focuses on a singular aspect of access—timing. The relevant inquiry is broader and looks to the whole "place and process" of the access and whether such materials were "historically [] open to the press and general public." *Id.* at 8. Thus, while timing plays a role in the overall question, the primary issue is whether this type of information was historically accessible to the press and public in the first place and whether that access served an important governmental function. The answers to both questions are undoubtedly yes.

There has always been a right to access newly filed civil and criminal complaints. Indeed, every circuit to consider the issue has uniformly concluded that the right applies to both civil and criminal proceedings. *See Dhiab v. Trump*, 852 F.3d 1087, 1099 (D.C. Cir. 2017) (Rogers, J., concurring in part and concurring in the judgment) (collecting cases). Nor can Omundson argue public access is unimportant. Afterall, press coverage of judicial proceedings is a "cornerstone[ ] of American democracy." Rachel Luberda, *The Fourth Branch of the Government: Evaluating the Media's Role in Overseeing the Independent Judiciary*, 22 Notre Dame J. L. Ethics & Pub. Pol'y 507, 513 (2008).

As many courts have explained, complaints "instantaneously invoke[] a court's jurisdiction," trigger legal obligations, and impact parties' "substantive legal rights and duties." *Schaefer*, 2 F.4th at 328. "The press and public thus have an important interest in reasonably contemporaneous access to civil complaints." *Id.*; *cf. Planet III*, 947 F.3d at 592 ("Public access to civil complaints before judicial action . . . buttresses the institutional integrity of the judiciary."). Because public access upon filing facilitates public scrutiny of

the court system, it plays a significant positive role in the function of civil court proceedings and governance.

Omundson's efforts to obscure this rather simple truth through definitional disagreements and a myopic focus on timing is ineffective. *See NAACP v. Button*, 371 U.S. 415, 429 (1963) ("[A] State cannot foreclose the exercise of constitutional rights by mere labels."). CNS had access to civil lawsuits in the past and that access served an important function.

Thus, in answering the question of whether CNS has had "historical" access to these documents, the Court finds that it has. Now, depending on how one views the definition of certain words, could CNS's previous access look different—from a timing standpoint— than its current access under Odyssey? Maybe. Similarly, if Omundson were to use different variations of the Odyssey software suite or another service provider (or no provider altogether) could that affect this definition? Potentially. But such esoteric questions miss the mark. The Court's finding today is that "filed" is defined as the moment a complaint is sent or uploaded to the Court's system. And for today's purposes, the Court finds that CNS has had that type of historical access sufficient to meet the first prong of the *Press-Enterprise II* test.

## B. Restrictions

Consistent with its conclusion above regarding history and the definition of "filing," the Court finds CNS has a right to access newly-filed civil complaints the moment they are uploaded to the Odyssey system. CNS does not currently have that access based on Omundson's restrictions. Thus, the Court turns to the second step of the *Press-Enterprise*

*II* framework: whether any restriction on CNS's right of access are "essential to preserve higher values" and "narrowly tailored to serve that interest." 478 U.S. at 13–14. The parties previously placed these arguments before the Court as part of their Motion to Dismiss / Motion for Preliminary Injunction briefs. The Court determined, however, that it could not rule on that question at that time since the inquiry is very "fact driven" and not "appropriate at the motion to dismiss stage." *Omundson*, 598 F. Supp. 3d at 938. The Court and Counsel now have the benefit of extensive discovery and can proceed with resolving this critical second question.

As part of its prior order, the Court noted that it "would like more briefing from both parties on the level of scrutiny to apply as part of its second-prong inquiry and whether Idaho's procedures constitute time, place, and manner restrictions." *Omundson*, 598 F. Supp. 3d at 939. In its briefing on summary judgment, CNS says the Court's question is "a bit of a red herring." Dkt. 61-1 at 16 n.3. It goes on to argue that *Planet III* clarified the strict scrutiny standard was not relevant because the "time, place, manner" analysis applicable to speech in public forums is not applicable in these types of press-access cases. *Id.* (citing *Planet III*, 947 F.3d at 596 n.9).

Respectfully, the Court did not pose a "red herring" issue for counsel. It was not trying to confuse or mislead anyone; it was simply asking a question to which it did not know the answer. CNS has now provided an answer—which the Court appreciates. That was the Court's point in asking. For its part, Omundson agrees that the Court in *Planet III* said it was not going to use a strict scrutiny test, but then argues it essentially did just that. While Omundson urges the Court not to follow suit, there is little reason to assess the

"confusing" analysis from *Planet III* (*see* Dkt. 85, at 13) further when the parties agree on the applicable standard. That standard is known—at least in the Ninth Circuit—as "rigorous scrutiny." *Planet III*, 947 F.3d at 596.

In order to prevail on the second step of *Press-Enterprise II*, Omundson "must demonstrate first that there is a 'substantial probability' that [her asserted] interest . . . would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that [] interest." *Id*. (quoting *Press-Enterprise II*, 478 U.S. at 14). Omundson bears the burden of satisfying this "fact-intensive" test, *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012), which requires more than generalized assertions or speculation. *New York Civil Liberties Union v. New York City Transit Auth*., 684 F.3d 286, 303 (2d Cir. 2012) ("[W]e do not believe speculation should form the basis for a restriction of the public's First Amendment rights.") (cleaned up); *Press-Enter. Co. v. Superior Ct*., 464 U.S. 501, 510 (1984) ("*Press-Enterprise I*") ("The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.").

Omundson begins by discussing the time accompanying her ministerial review and explains that even if there is some delay from when a civil complaint is filed to when it is available to the press and public, it is minimal at best. According to the data compiled by the parties, nearly 85% of complaints[12] were available within eight business hours of filing

---

[12] The data is restricted to Complaints in the "A.A. filing fee category." Cases in this category are civil cases where the amount in controversy exceeds $10,000. These are the only cases to which CNS seeks access.

(e.g. from the point of original submission), with over 70% of those complaints ready in under four hours, and 65% in less than three hours. Dkt. 60-2, at 21. As a reminder, the actual review process only takes about five minutes. But the delays that occur—and that CNS is worried about—come from the delays of life. That is to say, what takes time is not the individual review itself, but the county clerk finding time in their busy day to get the review done: going to their computer, getting logged into the system, accessing the documents, *and then* performing their five-minute review. The hours-long timeframes mentioned above are, therefore, the time from when a person files their documents to when the clerk allows those documents formally into the system. And this is why understanding the numbers is important. While Omundson correctly claims that it only took eight, four, or three hours from the time of filing to complete the five-minute review process, those are *business* hours. In other words, if a complaint was filed at 3:00pm on a Friday and reviewed by 9:00am the following Monday, that would only count as three business hours even though two and a half calendar days had elapsed. So, while Omundson's numbers may not stand out as overly long, when days are used (as CNS illustrates) the difference appears more dire: 42% of new complaints were not released until the day after filing, with 15% delayed two calendar days or longer. Dkt. 61-4, at 14.

The Court digresses momentarily to discuss the numbers in this case. The parties spent a great deal of time in discovery gathering data. That data was, quite literally, terabytes in volume and had to be submitted to the Court on an external hard drive. The parties had various individuals review, analyze, compile, and summarize these numbers. The problem with statistics, however, is they can be arranged and discussed in ways that

benefit each side. The Court is not implying the parties misled the Court in any way; simply that the numbers need to be looked at very closely. For example, during the timeframe the parties reviewed, the total number of cases filed in Idaho was 2,961,279. Dkt. 60-18, at 2–4. Of those, 177,677 were rejected, which is a 6% rejection rate. *Id*. But that was ALL cases (civil and criminal). As far as civil cases go, apparently 403,246 were filed in Idaho during the applicable timeframe the parties decided to use and 44,357 were rejected. *Id*. That is an 11% rejection rate. *Id*. But even then, the cases CNS wants access to are just the A.A. category cases. Omundson claims there were 8,645 A.A. category cases filed in all of Idaho during this time. *Id*. She does not list a rejection rate. CNS claims there were actually 9,497 such cases filed and 1,624 were rejected which is about a 17% rejection rate. Dkt. 61-4, at 5. A few additional comments about the data.

The Court thoroughly appreciates the parties' efforts here. It has reviewed the data (and the testimony analyzing the data). As noted, numbers can be used, and viewed, from different vantage points. And that is fine. What concerns the Court more is two inter-related issues.

First, Omundson claims that if the Court were to allow CNS to have access to complaints right out of the gate, it would wreak havoc on the system because judges would need to get involved to remedy the errors in those 177,677 rejected cases when they could have been resolved during the clerk review. This concern appears to be premised upon an Idaho rule relating to the handling of records and files once a case is officially open. To wit, Omundson claims a clerk cannot change things in the case without a judge's permission once it has become an official court file. Dkt. 66, at 49. But Omundson readily

admits that the Idaho Supreme Court could amend that rule to provide the clerk with more flexibility. *Id.* at 50. It is not clear to the Court why a judge, as opposed to a clerk, would need to fix the errors simply because the case was "officially on file" instead of in the "pre-processing" phase. The task is the same either way. So, if a rule appears to be dictating *who* can edit materials based on where the file is, it might make the most sense to simply change the rule.

Second and relatedly, the 177,677 cases that were rejected appear large in scale. But again, that is ALL cases (both criminal and civil) over an almost 18-month period. When the data is broken down into just the AA civil cases, the number of rejections per day is minimal (e.g. four or five per day *in the entire state*).[13] Thus, whether it is a judge or clerk that needs to address these cases, such could hardly be called burdensome. Omundson's point seems to be that if the Court finds its procedure is unconstitutional as to the A.A. category of cases, it will have to revamp the *entire* system. Thus, it won't just be those 1,624 rejections the Court has to deal with, but the 177,677 cases with errors. The Court is not so sure. CNS has narrowed its challenge to the A.A. category of cases. Thus, if the Court finds Omundson's procedures unconstitutional as to those cases, Omundson must change its procedure to remedy that discrete issue. The Court can only adjudicate the issue before it. The Court is not ignorant of the fact that the A.A. cases are just one component within a larger system. And the Court understands it might be difficult to break those cases out with a separate filing procedure, e.g. it might be easier to change the *whole* system as

---

[13] Those four or five per day would be spread out over 44 Counties.

opposed to just the A.A. cases. However, as will be discussed later, such is possible.

In summary, while the data is important—after all, the Court is to undertake a "fact-intensive" inquire—the Court is more concerned with the real-world application of that data. With those thoughts, the Court returns to Omundson's arguments.

More important than her contention that the delay in review is minimal, is Omundson's claim that there are compelling justifications under *Press-Enterprise II* for the delays themselves. Some of these justifications include: 1) catching errors in submissions, 2) protecting confidential information, and 3) maintaining public trust in the judiciary if documents are filed but not opened.

CNS avers none of these justifications rise to the level sufficient to overcome the presumption of access. Under the circumstances, the Court agrees.

For example, Omundson avers clerical errors may need to be corrected and this is an important interest that is worthy of protection. CNS does not dispute that correcting errors is important but points out that Omundson has not explained why those errors have to be corrected *before* the case is publicly available. The Court agrees with CNS that it does not undermine the process if simple errors are corrected after the documents become public rather than before. Other Courts share in these feelings. *See Courthouse News Serv. v. Gabel*, 2021 WL 5416650, at *15 (D. Vt. Nov. 19, 2021). ("Defendant[] offer[s] no evidence that staff review of signatures, filing fees, and filing codes is necessary to protect the orderly administration of justice."); *Planet*, 947 F.3d at 597 (finding no evidence that immediate access resulted in "accounting issues[,]" "compromised the quality and accuracy of information logged into the [case management system,]" "created efficiency

problems[,]" or "resulted in loss, destruction, or mutilation of, or otherwise compromised the 'integrity' of, case files"); *Courthouse News Serv. v. Jackson*, 2009 WL 2163609, at *4 (S.D. Tex. July 20, 2009) (finding twenty-four to seventy-two hour delays to verify correct case number, proper court, accurate title, and proper filing category were not narrowly tailored).

Omundson next argues she must ensure no confidential or personal information ends up in new filings. There should not be any confidential information in these types of filings to begin with as they are, by nature, nonconfidential civil cases. Second, even if a mistake is made and some personal information is included, is not Omundson's fault. Per IRERS 15(a), it is the filer's duty to ensure protected information is redacted from publicly submitted documents.[14] And to reiterate, this is not to say the information cannot ever be corrected. It can—just after it first becomes available to the public. While it may seem counter-intuitive to correct something once it becomes publicly available, the Court sees this happen quite frequently in federal court. The entire process does not crumble because edits have to be made to documents—even documents that are publicly available.

Omundson also claims that the public's trust in the judiciary could be compromised if it were inadvertently publishing information and data that was not supposed to be publicly available. But the opposite is also true: public trust could deteriorate if cases are delayed by the Court and news becomes stale. For its part, CNS contends that public trust

---

[14] The evidence shows that, during the two-and-a-half-year period the parties reviewed, there was a *single* instance in which a party submitted a motion to seal with the complaint asking that the information be sealed from public access.

actually increases when errors are corrected because that provides assurances the system is working. Moreover, the fact that some cases get rejected could be newsworthy. *See Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th at 1268-69 (noting that Defendants' argument that "providing access to complaints that may be rejected or withdrawn only invites confusion as to what is happening in a state's courts . . . overlooks the fact that the withdrawal or rejection of a complaint might itself be a matter of public interest that the press deems newsworthy"). Omundson cites to an example of a filing that included "nasty things" about the other party that was "caught and [not] allowed to be filed" claiming its review "saved" that from becoming public. Dkt. 85, at 31. By all accounts that was a singular instance, but more importantly, that filing in itself, could likely have been newsworthy.

In sum, the Court finds Omundson has not "demonstrate[d] . . . a 'substantial probability' that [her] interest in the fair and orderly administration of justice would be impaired by immediate access . . . ." *Planet III*, 947 F.3d at 596. Are Omundson's concerns irrelevant or imagined? Not at all. They are important concerns. But there is no evidence that giving CNS more timely access would hinder her ability to address those concerns. It would change the timing and order of operations to some degree, but it would not materially alter what Omundson is doing or the end result.

The Court moves to the next question—are there any alternatives to "adequately protect" Omundson's interest. *See id*. Although this second step is largely irrelevant considering the Court's finding that Omundson has not shown granting CNS immediate access would impair the administration of justice, the Court will assess it briefly because

it bolsters the Court's findings above (and provides Omundson guidance for how to move forward).

Omundson has argued there are no reasonable alternatives to the system Idaho currently uses. She outlines why a press-review queue will not work and why other options are cost-prohibitive and/or have failings of their own. CNS rejects all of these arguments, noting it really isn't up to the Court to decide which option is best, but whether the current option is constitutional. The Court agrees in part. The Court's duty is to determine whether the current schema is constitutional. But as noted, that inquiry includes analyzing whether any alternatives exist.

The problem for Omundson, quite frankly, is there does appear to be alternatives to the current system. And candidly, those alternatives seem reasonable. Other states use alternative methods with good success. Most federal courts, including Idaho, although not using the Odyssey system or Tyler Technologies, have alternative systems that do not have the same review process as Idaho state court, and they use those with success as well. *See* Dkt. 64, at 15.

Omundson's two primary concerns appear to be finances and a reluctance to change because the task would be arduous. The parties put forth competing fee amounts each believes would be necessary to make some of the changes which have been discussed. Those numbers range from $12,500 to $108,000. Omundson also implies it would take substantial effort—including changing Idaho filing rules, training staff, training attorneys—to revamp its procedures. The Court is sensitive to these apprehensions. But neither can justify an unconstitutional policy. *See Courthouse News Serv. v. Tingling*, 2016

WL 8739010 (S.D.N.Y. Dec. 16, 2016), ("As in *Planet* and *Jackson,* this Court finds that the clerk has failed to meet its burden of demonstrating that its policy of refusing to provide the public and press access to newly filed complaints until after they are reviewed and logged is either essential to preserve higher values or is narrowly tailored to serve that interest.").

Critically, the Court is not telling Omundson *how* she has to change her system as part of today's decision. It is simply finding that the *current* method is untenable. Omundson could revamp the entire system. Or she could just carve out A.A. complaints. She could use the press-review queue offered by Tyler Technologies. Or Idaho could develop its own program.[15] Whatever option she chooses, however, must allow CNS undelayed access. Otherwise, the policy will continue to be unconstitutional under the First Amendment, *Press-Enterprise II*, and *Planet III.*

## VI. CONCLUSION

The Ninth Circuit said in *Planet III* that a party does not have a First Amendment right to "immediate, pre-processing access to newly filed complaints." 947 F.3d at 594. Omundson claims that is basically what CNS gets, however, if the Court concludes she cannot meet her burden today. The Court agrees the balance between "CNS doesn't get immediate access" and "Omundson can't unreasonably delay access" puts the Court in a bit of a quandary. But the law is clear—a policy cannot withstand "rigorous scrutiny" unless there is a justification for the policy and there are no reasonable alternatives. *Id*. at

---

[15] In fact, is appears Omundson already began exploring whether Idaho could build its own portal or contract with another company to do so at a lower rate than Tyler was offering. Dkt. 66, at 35.

596. Ultimately, the Court finds Omundson has not met her burden to establish either factor.

First, CNS's right to access attaches when the complaint is filed. And filed is given its ordinary meaning: when a document is uploaded to the Court's e-filing system.[16] CNS has historically had access to newly-filed civil complaints and this access is an important public function. Thus, CNS has satisfied the first step of the *Press Enterprise II* test.

Second, while Omundson has valid reasons for undertaking a ministerial review of newly-filed complaints, there is no indication that granting CNS (and others) access prior to that review would impair or undermine her process. What's more, there are reasonable alternatives available that Omundson could utilize to make the process work for both sides. The Court will not dictate *what* Omundson must do moving forward, but under the second step of the *Press Enterprise II* test, she must do something because her current system impermissibly delays CNS's First Amendment access.

For all of these reasons, CNS's Motion for Summary Judgment is GRANTED and Omundson's Motion for Summary Judgment is DENIED.

## VII. ORDER

1.  Omundson's Motion to Seal (Dkt. 58) is GRANTED in PART and DENIED in PART as outlined above. The documents already under seal shall remain as such except the Docketing Clerk is directed to unseal Dkts. 59-2, 59-5, and 59-6. Redacted versions already filed shall remain on file.

---

[16] And, as explained above, "submitted" is given its ordinary meaning as well. The bottom line is the right attaches prior to any ministerial review when the document is uploaded to the system by a filer.

2. CNS's Motion for Leave to File Sur-Reply (Dkt. 77) is GRANTED.

3. Omundson's Motion for Summary Judgment (Dkt. 60) is DENIED.

4. CNS's Motion for Summary Judgment (Dkt. 61) is GRANTED.

5. The Court herby enters a declaratory judgment that Omundson's policy is unconstitutional. She is preliminarily and permanently enjoined from continuing any process that denies CNS timely access to new non-confidential civil complaints. Omundson has 90 days to bring her policies and procedures into substantial compliance with the Court's ruling today.

6. The Court will enter a separate judgment in accordance with Fed. R. Civ. P. 58.

DATED: September 30, 2024

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 35